IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES A. SCHULTZ,

                         Plaintiff,                                OPINION AND ORDER

    v.

                                                        22-cv-375-wmc

EDGERTON HOSPITAL AND
HEALTH SERVICES, INC.,

                         Defendant.

---

Plaintiff James Schultz contends that defendant Edgerton Hospital and Health Services, Inc. terminated him from his job as CEO in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA").  Schultz has moved to supplement the record with Edgerton Hospital's amended interrogatory responses, and the court will grant his motion.  Edgerton Hospital has moved for summary judgment, contending that it fired Schultz because of his poor performance.  (Dkt. #13.)  Because Schultz has presented evidence from which a reasonable jury could conclude that Edgerton Hospital fired him because of his age, the court will also deny its motion for summary judgment.

UNDISPUTED FACTS[1]

A. The Parties

Edgerton Hospital is a full-service hospital with about 210 employees.  After serving as the chair of Edgerton Hospital's 13-member Board of Trustees, the hospital hired Schultz as its "interim" CEO in May of 2014, when he was two weeks shy of his 68th birthday.  The Board later hired Schultz as its CEO without the interim designation in May of 2015, when he was almost 69.  Schultz served as CEO from May 2015 until October 2020 when the Board terminated his employment at age 75.

B. The CEO Position and Edgerton Hospital's Policies

The CEO is the *only* Edgerton Hospital employee supervised by the Board and serves at its pleasure.  Edgerton Hospital's bylaws require that the CEO have a written contract and that any change "to the terms and provisions of the [CEO's employment agreement] shall be . . . approved by the [Board]." (Def.'s Ex. 1 (dkt. #16-1) 17.)  Edgerton Hospital's bylaws further state that, "[t]here shall be an annual review/evaluation of the CEO by the [Board]."  (*Id.*)

Schultz's job description also states that the CEO should work closely with hospital managers, department heads, and medical staff, and is expected to:  (1) direct and supervise all hospital activities and to hold administration team members accountable for the results

---

[1] Unless otherwise noted, the following facts are undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, when taken "in the light most favorable to [plaintiff as] the nonmovant and avoid[ing] the temptation to decide which party's version of the facts is more likely true." *Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014).  As for defendant's five, general objections to plaintiff's response to defendant's proposed findings of fact in support of their motion for summary judgment (dkt. #37, pp. 1-6), they should be deemed denied with respect to the following, undisputed facts.

of their department; (2) maintain high employee morale and a professional and healthy work environment; (3) work closely with medical staff and hold them accountable for their performance; and (4) work closely with the Board by providing regular reports to it and acting upon its decisions and directives.  (Def.'s Ex. 27 (dkt. #17-4) 1-3.)

### C.  Conflict with the Board Beginning in 2018

There were no documented issues with Schultz's performance as CEO until March 2018 when, according to an e-mail from the Board's then Secretary, Cindy Swanson, documenting the timeline of the issue, Schultz was "nonresponsive" to Board concerns about Edgerton Hospital's human resources department.  (Def.'s Ex. 3 (dkt. #16-3) 1.)[2] In March, Swanson further told Schultz that employees had complained the Hospital's human resources director was unapproachable and did not work his scheduled hours.  (*Id.*; Def.'s Ex. 4 (dkt. #16-4).))  Later that month, the Board's Executive Committee met without Schultz to discuss "how best to diplomatically address the issues with [him]." (Def.'s Ex. 3 (dkt. #16-3) 1.)

Following this meeting, Schultz sent an e-mail dated March 30, 2018, to Dr. Jay Peterson, the Board Chair at the time, expressing concern about the Executive Committee improperly meeting without him, as well as his concern with hospital employees directly lobbying the Board.  (Dkt. #40-1, at 2.)  Among other things, Schultz suggested that the Board's behavior created "an issue of trust and integrity."  (*Id.*)  In response, Dr. Peterson

---

[2] Swanson was herself 67 years old and the Secretary of the Board when Schultz was appointed CEO on an interim basis, and she was also on the Board when it removed his interim status in May of 2015.

defended the Board's decision to meet without Schultz, noting that the Board "worr[ied] too much that you [felt] that it's a personal attack on you when we have suggestions or issues." (*Id.* at 1.) Dr. Peterson further explained that all the Board wanted him to do was create a "plan of action" for getting human resources back on task. (*Id.*)

Dr. Peterson followed up with Schultz about this plan of action in early April. (Dkt. #40-2.) Then, in late April, Dr. Peterson e-mailed the Board noting that it would ask Schultz about his failure to create the plan of action for the human resources department at its April meeting. (Dkt. #40-3.) In May, Swanson sent an e-mail to the Board noting that Schultz had still not provided the plan, (Def.'s Ex. 3 (dkt. #16-3)), and at a June Board meeting, Schultz told the Board that he did not plan to present one. (Def.'s Ex. 4 (dkt. #16-4.)) At some point, Schultz represents he had discussed the issue with the human resources director and decided to monitor the director's time. (Schultz Decl. (dkt. #35) ¶¶ 61-62.)

Dr. Peterson resigned as Board Chair in 2019, and states in a declaration that under Schultz's leadership, the hospital stopped losing money, employee morale improved and Edgerton Hospital had become more respected. (Peterson Decl. (dkt. #33) ¶¶ 5-8.) He added that he was personally aware of no issues that would warrant firing Schultz when he left the Board. (*Id.* ¶ 9.)

Apparently, no further issues arose between Schultz and the Board until 2020. In January 2020, the Board had elected Cynthia Swanson as its new chair, and she requested to see Schultz's personnel file. At that time, Swanson learned that Schultz did not have an employment contract because he was "not interested in [it]," and he did not feel it was

necessary given his long-term commitment to Edgerton Hospital.  (Schultz Dep. (dkt. #21) 16.)  In her personal notes, Swanson also wrote that Dr. Peterson had told her that Schultz had improperly requested and received raises without Board approval.  (Def.'s Ex. 5 (dkt. #16-5) 1.)  Schultz disputes this, asserting that these increases in pay did not need to be authorized by the Board and were proper "market adjustments."

In February 2020, shortly after her election as Chair, Swanson (who was by then 72 or 73 herself) told Schultz that they may have been friends, but as Board Chair, she would "move forward 100 percent."  (Swanson Dep. (dkt. #27) 6.)  She then allegedly told Schultz, "I'm in charge now, and you're probably not going to like some of the things I'm going to do."  (Schultz Decl. (dkt. #35) ¶ 15.)  She then asked Schultz if he enjoyed his job, and when he said that he did, she then told him, "[y]ou're [75] years old and should consider retiring."[3]  (Id. ¶ 16.)  In the months after Schultz's meeting with Swanson, other unspecified Board members told him that he looked "tired and stressed for his age," asked how much longer he wanted to be CEO and if he enjoyed the job.  (Id. ¶ 17; Schultz Dep. (dkt. #21) 54.)  Board members also asked him three times if he was ready to retire.  (Schultz Decl. (dkt. #35) ¶ 17; Schultz Dep. (dkt. #21) 54.)  Moreover, on unspecified dates, Board member Teri Johnson twice asked Schultz if he was ready to retire, asking, "You're old enough, aren't you?"  (Schultz Decl. (dkt. #35) ¶ 19.)

While Swanson asserts that Schultz would ignore her and the other Board members, Schultz generally disputes this.  (Id. ¶ 68; Swanson Dep. (dkt. #27) 11.)  More specifically,

---

[3] While defendant disputes that Swanson or any other Board members commented on Schultz's age or possible retirement at any time, the court must credit Schultz's version of their exchange at summary judgment absent directly contradictory, sworn testimony at Schultz's deposition.

defendant asserts in reply that Schultz attended a Board meeting where he did not acknowledge any of the Board members; he also told the Board members "if you guys don't like the way I'm handling this . . . you do it yourselves," then he left the meeting.  (Swanson Dep. (dkt. #27) 11.)  After that meeting, defendant also replies that Schultz did not speak to Swanson for weeks.  (*Id.* at 12.)  Schultz also supposedly told members of his administrative team that he would fire them if they spoke to Swanson or other Board members.  (*Id.*)[4]

In addition, an Emergency Department physician complained in early 2020 that Edgerton Hospital's Emergency Department Manager was neither working his assigned hours nor seeing patients in a timely manner.  There were also complaints about the Department Manager's treatment of nursing staff.  In particular, after new complaints had surfaced about the doctor who had originally complained about the Emergency Department Manager, Schultz apparently investigated the allegations in May 2020.  (Def.'s Ex. 8 (dkt. #16-8) 3-4.)  Later that month, Swanson e-mailed Schultz explaining that she was troubled by his failure to respond to her requests for an update on a medical review of the complaining doctor.  (*Id.* at 3.)  Schultz responded, "I regret that you feel that I was nonresponsive to you," and explained that he had been waiting to involve the Board until after he had finished his investigation.  (*Id.* at 4.)  Regardless, Schultz provided the medical review findings to the Executive Committee in June 2020.  (*Id.* at 5.)

---

[4] Whether these specifics are accepted by a trier of fact remains to be seen since many specific details were not timely offered in defendant's proposed findings of fact but rather in reply and are in general denied by plaintiff in any event.

However, in July 2020, Schultz sent Swanson an e-mail about a nurse who had provided the Board with information about negative behavior by one of the Emergency Department physicians.  (*Id.* at 1.)  Schultz wrote that it was not "ideal" that the nurse contacted the Board directly stating, "we don't want to set a precedent of hospital employees running to the Board with every issue." (*Id.*)  He added that the nurse's account was not completely accurate and had "no bearing on anything at all." (*Id.*)  Swanson responded that she believed that the nurse had e-mailed the Board because he wanted to be taken seriously and not have his opinion dismissed.  (*Id.* at 2.)  She wrote, "when an employee has come forward to me or to another Board member with an issue it has been because they felt they had exhausted all other avenues, had no one else to go to with their problem, and feared being fired if they disagreed, challenged, or angered you." (*Id.*)

Also in 2020, the Board learned that the doctor running Milton Clinic, which was operated by Edgerton Hospital, had fallen more than 30 days behind on his medical charting. (Def.'s Ex. 28 (dkt. #18-1.))  Even so, Schultz defended the doctor to the Board at the September 2020 Board meeting, explaining that the doctor was well thought of by patients, was contributing positive ideas for changes at the clinic, and had met with Schultz to address his charting issues.  (Schultz Decl. (dkt. #35) ¶¶ 66-67.)

**D. Employee Surveys**

At the May 2020 Board meeting, four members were present (Board Chair Swanson and three other members) and discussed Schultz's relationship with the Board.  (Def.'s Ex. 9 (dkt. # 16-9.))  The minutes from that meeting note Schultz having ignored human resources issues discussed above and the investigation into the emergency room doctor, as

well as his alleged unprofessional conduct and rudeness to Swanson.  (*Id.*)  At that point, the Board decided to review Schultz's overall performance, although it fired him before completing that review.  (Swanson Dep. (dkt. #27) 13.)

In July 2020, Swanson also sent a paper survey to 38 employees' homes, including 24 managers and coordinators, 4 administrative team members, and 10 Board members. In past surveys, the hospital had used an independent contractor or SurveyMonkey, an electronic survey provider.  (Schultz Dep. (dkt. #21) 44; Def.'s Ex. 10 (dkt. #16-10.)) However, as to this survey, Swanson was responsible for selecting those who received it, but she used an existing list to send it to the managers.  (Swanson Dep. (dkt. #27) 18.) Some of the survey recipients did not report to Schultz, and he had disciplined two of the managers.  (Schultz Decl. (dkt. #35) ¶¶ 24, 32.)  Swanson also chose not to send the survey to doctors who reported to Schultz.  (*Id.* ¶ 24.)  Swanson explained that even though Schultz had completed his investigation into Edgerton Hospital's Emergency Department, rumors about his investigation were still "rampant," and she worried that including the physicians in the survey would somehow "muddy up the waters."  (Swanson Dep. (dkt. #27) 18-19.)

Responses to the survey were anonymous,[5] and called for a rating of Schultz's performance across four categories -- "leadership," "drive for results," "communication" and "teamwork" -- on a scale of one to five: (1) very dissatisfied; (2) dissatisfied; (3) neutral; (4) satisfied; and (5) very satisfied.  (*E.g.*, Def.'s Ex. 13 (dkt. #16-13) 1-2.)  The survey

---

[5] Some survey recipients identified their completed surveys during their depositions.

also allowed recipients to provide written feedback.  (*Id.*)  In all, 32 responses were received to the survey, which Swanson tabulated as follows:[6]

|  | Very Satisfied + Satisfied | Dissatisfied + Very Dissatisfied | Neutral | N/A |
|---|---|---|---|---|
| Leadership | 33% | 41% | 24% | 2% |
| Drive for Results | 41% | 35% | 20% | 3% |
| Communication | 29% | 49% | 22% | 0% |
| Teamwork | 30% | 41% | 26% | 2% |

(Ex. 16-14 (dkt. #16-14) 1.)[7]

In addition, many respondents submitted comments about Schultz's performance as CEO.  Some of those comments were negative.  Five respondents commented that Schultz perpetuated a sexist culture, including that: "Mr. Schultz has allowed an environment of favoritism and sexism to grow beyond anything I have seen at previous employers"; and "[t]here is a 'boy's club' atmosphere".  (Def.'s Ex. 13 (dkt. #16-13) 8, 23-24, 27, 33, 42).  Seven respondents commented separately on his poor communication

---

[6] For unexplained reasons, the percentages do not always add up to "100" across any specific category.

[7] Schultz objects that the survey results are inadmissible hearsay and lack foundation.  However, insofar as the survey results were considered by the Board at the time that it was evaluating Schultz's performance, the responses are not offered to prove the truth of the matter asserted and are therefore not hearsay.  Fed. R. Evid. P. 801(c)(2); *see also Luckie v. Ameritech Corp.*, 389 F.3d 708, 716 (7th Cir. 2004) (statements were not hearsay because they showed decision-maker's state of mind at the time she was evaluating plaintiff's performance).  Further, Swanson's declaration explaining the survey process provides adequate foundation for the survey results absent a proper objection under Fed. R. Evid. 1006.  (Swanson Decl. (dkt. #16) ¶¶ 59, 62.)  The rest of the criticism is for cross-examination or argument at trial.

skills, noting: "[p]rone to verbal outbursts, verbal attacks, fist pounding on the table"; and "[b]elieves the 'silent treatment' is an effective tool for dealing with staff." (*Id.* at 2, 9, 13, 15, 22, 34-35, 47.)  Finally, eight respondents wrote that Schultz was a poor leader, stating generally that he was indecisive and did not lead by example, and more specifically as to one respondent that he "appeared to have no knowledge of or experience in managing people and [was] unaware of what can or cannot be accomplished by staff in the different departments." (*Id.* at 8, 13, 14, 20, 21, 23, 27, 33, 41-42, 85.)

In contrast, some of the comments were quite positive.  Five respondents wrote about Schultz's effective work as CEO, noting his dedication to his role, success in recruiting new medical specialists and his approachability.  For example, respondents wrote that: "[Schultz] is fair, with a very forward[-]looking business perspective as to the direction of medicine and our future in it"; "our CEO is very passionate about the success of the hospital"; "[he] is the least intimidating and most easily approachable CEO of any hospital CEOs I have experience with"; and "he takes time to talk to entry level staff and solicit feedback from them as well as managers and Admin." (*Id.* at 38, 45, 61-62, 71.) The Edgerton Hospital Foundation director also submitted a letter along with her survey response that commended Schultz's leadership and fundraising ability.  (*Id.* at 78.)  In his survey response, Dr. Bhanu Sankineni, the Chief of Staff at Edgerton Hospital, further noted Schultz's enthusiasm, approachability and development of new specialty services at the hospital.  (Dkt. # 34-3) 2-3.)  Finally, Swanson's survey rated Schultz's performance well, giving him fours and fives in all categories, but she did not leave any comments.  (Dkt. #34-4.)

Around the same time that the Board conducted its survey, Dr. Sankineni, who had a great working relationship with Schultz, sent out a survey of his own to 10 of the Hospital's physicians after staff members complained to him that Swanson had cherry-picked survey recipients who did not like Schultz.  (Sankineni Dep. (dkt. #28) 5.)  Six physicians took the survey, and no respondents indicated that they were "very dissatisfied" or even "dissatisfied" with Schultz's performance and attributes.  (Dkt. #19-5 and Dkt. #34-2, at 1-14.)  Those respondents also commented that Schultz was a "[g]reat CEO," a "problem solver," and an impressive leader.  (*Id.* at 3.)  Dr. Sankineni sent this survey to the Board, (Sankineni Dep. (dkt. #28) 8), but the Board did not consider it. (Swanson Dep. (dkt. #27) 19.)

### E.  The Board Terminates Schultz's Employment

In August 2020, Swanson commented that Schultz looked tired and stressed. (Schultz Dep. (dkt. #21) 21.)  Schultz also stated that Dr. Sankineni, who was on the Board, told him that Swanson and another Board member made unspecified comments about his age and retirement during closed session at the August or September Board meeting.  (Schultz Dep. (dkt. #21) 55-56.)  However, at his deposition, Dr. Sankineni could not remember if any Board members commented on Schultz's age or retirement. (Sankineni Dep. (dkt. #28) 11.)[8]

---

[8] Stephanie Angst, a manager who was a recipient of the survey but was not involved in his termination, also apparently referred to Schultz as "an old man who [did] not know what he [was] doing" while talking with other employees.  (Schultz Decl. (dkt. #35) ¶ 20.)  However, there is no evidence that any Board members overheard Angst's comment.  Moreover, as punishment for her comment, Angst received a verbal warning.  Thus, the admissibility of her comment is dubious at best.

Swanson's notes from the August 2020 closed Board meeting refer to a discussion of their plans to review Schultz's performance.  (Dkt. #34-5.)  More specifically, she noted that the Board was concerned that the work environment had become toxic and that employees were unhappy.  (*Id.*)  She also noted that "three female key players" had told her that they sought legal counsel for blatant sexual discrimination, although Schultz disputes that one of the women, Sue Alwin-Popp, did so, as she denied both being sexually discriminated against at Edgerton Hospital *and* seeking legal advice about discrimination against her during her deposition in this case.  (Alwin-Popp Dep. (dkt. #25) 10.)

There is no dispute Swanson shared her survey results with the other Board members.  (Swanson Decl. (dkt. #16) ¶ 60; Shoemaker Dep. (dkt. #24) 21.)[9]  Moreover, at the September 2020 meeting, it is conceded that the Board discussed Schultz's job performance and length of employment before voting to terminate his employment.  In particular, following the October 12 meeting of the Executive Committee, the Board decided to terminate Schultz's employment via e-mail; that same day, Swanson notified Schultz of the Board's decision to terminate his employment.  Alwin-Popp, who was 65 years old at the time, was then appointed interim CEO under Edgerton Hospital's "absence of CEO" policy.  Finally, on March 1, 2021, Edgerton Hospital hired 54-year-old Marc Augsburger as the CEO.

---

[9] Paul Shoemaker was also a Board member when it fired Schultz.

OPINION

Plaintiff contends that defendant terminated his employment because of his age in violation of the ADEA, which expressly prohibits employers from discriminating against any employee older than 40 "because of" the employee's age.  29 U.S.C. § 623(a)(1), 631(a).  Because plaintiff was 75 years old at the time he was terminated, he qualifies for protection under the Act.  *Id.*  § 631(a).  To succeed on his claim, however, plaintiff must produce evidence from which a reasonable jury could infer that his age was a "but-for" cause of defendant's decision to terminate his employment.  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009); *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014).

Plaintiff may satisfy this burden by introducing direct or circumstantial evidence that defendant fired him because of his age.  *Skiba v. Illinois Central Railroad Co.*, 884 F.3d 708, 719 (7th Cir. 2018).  Alternatively, plaintiff may proceed through the burden-shifting framework adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.*  Under this burden-shifting approach, plaintiff must come forward with evidence showing that he: "(1) is a member of a protected class, (2) was meeting the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) [was] similarly situated [to] employees who were not members of [his] protected class [and] were treated more favorably."  *Id.* (quotation marks omitted).  If the plaintiff establishes this *prima facie* case under *McDonnell Douglas*, the burden shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is

13

pretextual.'" *Carson v. Lake County, Indiana*, 865 F.3d 526, 533 (7th Cir. 2017) (citation omitted).

"However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action because of [his] age." *Id.* (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ("Th[e] legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action.  Evidence must be considered as a whole. . . .").  Similarly, summary judgment is only appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In this case, plaintiff points to the following as evidence of age discrimination: (1) age- and retirement-related statements by Board members; (2) defendant ultimately hiring a much younger replacement for CEO; and (3) preferential treatment to younger employees.  Taking plaintiff's evidence as a whole and in the light most favorable to him, a reasonable jury could conclude that defendant fired him because of his age.

Even so, as already alluded to above, defendant argues that some of plaintiff's evidence of discriminatory comments are unpersuasive, if not wholly inadmissible.  For

14

example, defendant contends plaintiff's representation that Dr. Sankineni *told him* that Swanson and another Board member commented on his age at the August or September Board meeting is simply inadmissible hearsay.  *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("[S]ummary judgment requires a non-moving party to respond to the moving party's properly-supported motion by *identifying specific, admissible evidence* showing that there is a genuine dispute of material fact for trial." (emphasis added)).  However, since Dr. Sankineni, Swanson and the other individual were all members of the Board, Dr. Sankineni's claimed attributed comments by other Board members may not be hearsay at all, but rather admissible as statements of a party opponent under Fed. R. Evid. 801(d)(2). In any event, the court need not resolve this evidentiary issue now because, even without Dr. Sankineni's statement, a reasonable jury could conclude that defendant terminated his employment because of his age as explained below.

Similarly, plaintiff provides no dates for Board member Johnson's asking about plaintiff's retirement plans.  Thus, the court can only speculate at summary judgment whether Johnson's arguably age-related comments occurred closely enough to the Board's termination decision to be relevant.  *E.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion" (quotation marks omitted)).

Finally, plaintiff's reliance on Angst's comment about his age does not show that *the Board members* discriminated against him, because she was not a decision-maker, and there was no evidence that any Board member overheard her comment.  Moreover, even though Angst did receive a survey, plaintiff provides no evidence that she filled it out; and even if

she did fill it out, her survey would have been just 1 out of 32 returned surveys, leaving her discriminatory comments far short of a "but for" cause even if somehow attributed to the Board.  *See Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (explaining that nondecisionmaker's comments were only relevant if nondecisionmaker had "singular influence over the decisionmaker" (quotation marks omitted)).

Further, plaintiff's proposed, younger comparators are not similarly situated to him. Indeed, he only identified three, substantially younger employees who defendant provided with opportunities for corrective action -- Angst (Safety Officer and Infection Prevention Manager), Andrea McSherry (Quality Director), and Dr. Brian Stubitsch (Chief Medical Officer).  However, not one of these employees had the same supervisor as plaintiff, since by definition, plaintiff was the only employee supervised by the Board.  Plus, plaintiff offers no evidence that these employees had the same job duties or engaged in similar conduct as he. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) ("In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct . . . ." (quotation marks omitted)).  Again, by definition as plaintiff was the CEO, the evidence is very much the opposite.

Nonetheless, a reasonable jury *could* conclude that defendant terminated his employment because of his age based on: (1) Swanson's statement when she started as Board Chair, "[y]ou're [75] years old and should consider retiring"; (2) her August 2020 comment that Schultz looked tired and stressed; (3) other Board members commenting that he looked "tired and stressed for his age"; (4) Board members suggesting three times

16

that he retire; *and* (5) defendant ultimately hiring a much younger replacement CEO. *See Kaniff v. Allstate Ins. Co.*, 121 F.3d 258, 263 (7th Cir. 1997) (jury could infer discrimination when "employee in the protected age group was hounded about retirement despite evidence of adequate performance.").

In response, defendant rightly points to non-discriminatory reasons for terminating his employment, including negative, employee-survey results. To be sure, a reasonable jury *could* find those survey results sufficiently negative to have caused plaintiff's firing, as between 35 and 49 percent of survey respondents indicated that they were "dissatisfied" or "very dissatisfied" with plaintiff's leadership, drive for results, communication and teamwork. Also, a smaller number of survey respondents observed that plaintiff had perpetuated a sexist culture at the hospital and was prone to verbal outbursts or giving hospital staff the "silent treatment." Defendant also points to plaintiff's perceived "unresponsiveness" to Board requests for information about personnel issues in 2018 and 2020 as a non-discriminatory reason for terminating him.

However, plaintiff has also offered enough evidence for a reasonable jury to conclude that the defendant's nondiscriminatory reasons for his termination were pretextual. Starting with the survey, plaintiff has pointed to several flaws in its execution. First, defendant had never before reviewed plaintiff's performance during his four years as CEO. Instead, the Board began its only review of plaintiff -- which included conducting the survey -- shortly before it fired him. Second, Swanson, who Schultz and perhaps others claim made ageist comments and pressured plaintiff to retire, selected the survey recipients, sent the survey to less than 20 percent of hospital employees *and* sent it to 2 managers that

plaintiff had disciplined.  Third, Swanson inexplicably chose not to send the survey to doctors who were among plaintiff's direct reports.  Swanson explained that she did not want to "muddy" the waters with the doctors' surveys because of rumors about plaintiff's resolution of a conflict in the Emergency Department, but her explanation is vague at best, and also arguably would not support excluding *all* doctors from the survey mailing list, many of whom presumably do not work in the Emergency Department.  Finally, the Board has offered no reason for not finishing its own job review before terminating plaintiff's employment.

Turning to plaintiff's non-responsiveness to the Board itself, a reasonable jury could again conclude that that reason was pretextual on this record because: (1) the Board appears to have offered only two instances of non-responsiveness over plaintiff's five years as CEO; and (2) Swanson, who allegedly made ageist remarks and pressured him to retire, was involved in both instances.[10]

In short, even though defendant provided evidence indicating that plaintiff may have been performing poorly as CEO and was not communicating adequately with the Board, the circumstances of the survey and his non-responsiveness leave room for a reasonable jury to conclude that these reasons for his firing were pretextual, and his seemingly precipitous firing would not have gone forward but for the Board's ageism.

---

[10] The court makes no finding as to the appropriateness of a "cat's paw" instruction at summary judgment.

18

ORDER

IT IS ORDERED that:

1)  Plaintiff's motion to supplement the record, dkt. #43, is GRANTED.

2)  Defendant's motion for summary judgment, dkt. #13, is DENIED.

Entered this 29th day of November, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge